IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LARRY MILLS, *on behalf of himself and all similarly situated consumers*,

    Plaintiff,

v.

SPECIALIZED LOAN SERVICING, LLC,

    Defendant.

Civil Action No. 1:24-cv-63

**CLASS ACTION COMPLAINT**

Plaintiff Larry Mills, on behalf of himself and all similarly situated consumers, files this Complaint against Defendant Specialized Loan Servicing, LLC ("SLS") and alleges as follows:

**PRELIMINARY STATEMENT**

1. Mr. Mills purchased his home in Fairfax County, Virginia in March 2005 using the predatory 80/20 mortgage loan scheme.

2. In January 2007, he refinanced his home, again through a predatory 80/20 mortgage loan scheme.

3. Despite being victims of this predatory lending practice, Mr. Mills was able to save his home during the 2007-08 mortgage crisis by modifying his first mortgage through the HAMP program.

4. After Mr. Mills obtained a HAMP modification, he believed that his second mortgage was resolved as part of the modification. This belief was supported by the fact that he stopped receiving monthly mortgage statements about his second mortgage after his HAMP modification.

5. Mr. Mills has not made any payments towards his second mortgage since November 1, 2008.

6. Unbeknownst to him, Mr. Mills's second mortgage was assigned to SLS for servicing on November 2, 2009. Mr. Mills never received notice of the transfer.

7. At the time that SLS received the servicing rights to Mr. Mills's second mortgage, the mortgage had been charged off, and no one was sending him monthly mortgage statements.

8. SLS did not start sending Mr. Mills monthly mortgage statements when it acquired servicing rights to his loan.

9. After more than a decade of hearing nothing about his second mortgage, SLS is now threatening foreclosure of Mr. Mills's home through his second mortgage.

10. SLS, however, is seeking to collect a vastly inflated amount that Mr. Mills does not owe.

11. For example, the original balance of Mr. Mills's second mortgage was $144,000. And even though he hasn't received any monthly statements since before 2009, SLS claims that he is past due almost $235,000.

12. As explained below, these interest charges were not permissible unless SLS was sending monthly statements.

13. Because SLS's charging of interest during times in which consumers were not sent monthly statements appears to be SLS's standard policy and practice, Mr. Mills alleges a class claim against SLS for making false and misleading representations about the amount of his second mortgage in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e.

14. Mr. Mills also alleges individual claims against SLS for SLS's improper servicing of his loan, including under the FDCPA, § 1692f, for threatening foreclosure of his home when

there was no present right to possession of the property, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e)(2), for failing to properly respond to his Qualified Written Request.

## JURISDICTION AND VENUE

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1692k.

16. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## PARTIES

17. Mr. Mills is a natural person who lives in Fairfax County, Virginia. He is a consumer as defined by 15 U.S.C. § 1692a(3).

18. SLS is a foreign limited liability company with its principal place of business in Highlands Ranch, Colorado. SLS is a mortgage loan servicing company governed by RESPA.

19. SLS is also a debt collector under the FDCPA because it treated Mr. Mills's loan as in default at the time it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355,362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003).

## FACTS

### *Zombie Second Mortgages*

20. This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

21. Prior to the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

22. During the Great Recession, many borrowers in 80/20 mortgage schemes were required to modify their first mortgages to remain in their homes, while their second mortgages were charged off or significantly reduced or forgiven as part of the HAMP Second Lien Modification Program ("2MP Program"). *See* https://www.hud.gov/sites/documents/MAY2014MHAREPORTFINAL.PDF ("Provides modifications and extinguishments on second liens when there has been an eligible first lien modification on the same property) (last visited Jan. 9, 2024).

23. Once charged off or extinguished, consumers no longer received statements or heard anything about their second mortgages, sometimes for more than a decade, like Mr. Mills.

24. Because charge-offs or cancellations typically happened around the time that consumers modified their first mortgages, many believed that the modification of their first mortgage also resolved their second mortgage—a belief that was perpetuated by the fact that consumers no longer received statements relating to their second mortgages.

25. Unbeknownst to many consumers, however, their second mortgages did not go away.

26. Instead, they were sold—often several times—to various debt buyers and subprime lenders.

27. Now, with the recent surge in housing prices, consumers have significant equity in their homes that make charged-off second mortgages highly profitable.

28. Debt collectors, like SLS, are now seeking to collect on defaulted second mortgages and, if consumers cannot pay, debt buyers are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding loan.

29. This highly profitable scheme has surged in recent months, as home prices have increased and COVID foreclosure moratoriums have expired.

30. Even worse, debt collectors are not collecting the amount due on the mortgages when they are charged off, as the law requires.

31. Under Truth-in-Lending-Act regulations, once a mortgage is charged off, the servicer is no longer required to send monthly statements, but it cannot assess any additional late fees or interest on the account. 12 C.F.R. § 1026.41(e)(6)(i).

32. Instead, the servicer may resume charging interest and fees on the account only if it resumes sending monthly statements, but it may not retroactively assess any fees or interest for the time during which statements were not sent. 12 C.F.R. § 1026.41(e)(6)(ii).

33. Yet servicers are retroactively assessing late fees and adding interest to the loans—amounts that were waived by the prior loan servicers—and are seeking to collect vastly inflated amounts from consumers.

34. In Mr. Mills's case, for example, his loan balance almost doubled because of improper fees and charges.

35. When debt collectors, like SLS, can foreclose on properties and collect these improper charges, it not only robs the consumers of their homes, but it also strips them of tens of thousands of dollars in equity—one of the primary ways that low-income and middle-class families can build wealth.

### *Mr. Mills's Zombie Second Mortgage*

36. Mr. Mills purchased his home in Fairfax County, Virginia in March 2005, where he lives with his wife and four children.

37. Mr. Mills later refinanced the home in January 2007.

38. As was common at that time, Mr. Mills purchased and refinanced his home using two mortgages.[1]

39. A few years after purchasing his home, Mr. Mills suffered financial difficulties—he worked at a car dealership, and business dropped dramatically during the Great Recession. As a result, his income also decreased.

40. Mr. Mill began the process of applying for a loan modification on his first mortgage.

41. Mr. Mills's first mortgage was permanently modified under the HAMP program in effect at that time.

42. Around that time, Mr. Mills stopped receiving monthly mortgage statements for his second mortgage.

43. Mr. Mills believed that the lack of statements was because after the HAMP modification of his first mortgage, his second mortgage was cancelled by President Obama's 2MP programs in effect at the time.

44. Mr. Mills did not hear anything about his second mortgage for nearly 13 years.

45. In February 2022, out of the blue, Mr. Mills received a letter from SLS stating that his mortgage has been sold to FirstKey Master Funding 2021-A.

46. Mr. Mills had never heard of SLS or FirstKey, so he assumed that these letters were a scam—again, he believed that his second mortgage had been resolved more than a decade earlier..

---

[1] https://www.consumerfinance.gov/ask-cfpb/what-is-a-piggyback-second-mortgage-en-1955/ (last visited Jan. 9, 2024).

47. Then, in December 2022, Mr. Mills received a foreclosure notice from BWW Law Group, which stated that his home was scheduled for a foreclosure sale on March 1, 2023 unless he cured an arrearage of $217,970.42.

48. Mr. Mills was confused and did not understand how his loan, which he believed had been resolved, could be referred to foreclosure or how the balance would have gotten so high.

49. Mr. Mills immediately called BWW, who informed him that he needed to contact SLS to avoid foreclosure.

50. Mr. Mills also reached out to FirstKey Master Funding 2021-A, but was unable to reach a live person, so he left a message asking for more information. Nobody ever called him back.

51. Mr. Mills also called SLS to try and resolve the second mortgage so that he could avoid foreclosure and stay in his home of almost 20 years.

52. He applied for a loan modification to try and resolve the alleged default.

53. SLS told Mr. Mills that in order to obtain a loan modification, he needed to agree to repay $340,591.46 and make a downpayment of $65,203.84 by March 3, 2023. He could also conduct a short sale of the home or pay off the loan in full.

54. Mr. Mills could not afford a $65,000 down payment. Even if he could have, SLS's offer would have required Mr. Mills to pay almost $200,000 more than the original principal balance of his home, most of which was interest and fees that accrued during the time that SLS was not sending him any monthly statements.

55. After SLS denied Mr. Mills's loan modification application, it started sending him monthly statements.

56. For example, on January 17, 2023, SLS sent Mr. Mills a monthly statement stating that the total amount due on his second mortgage was $219,296.13 and that the accelerated amount on the loan was $356,258.02.

57. This correspondence was a demand for payment because it included, for example, the amount of the debt, described how the debt could be paid, and provided payment instructions.

58. The amount listed in this letter was incorrect because it included fees and interest that had been assessed to the loan during the time when Mr. Mills was not being sent monthly statements.

59. Over the next year, SLS continued sending Mr. Mills monthly statements listing similar balances.

60. Each of these statements was a demand for payment that listed a materially incorrect amount because it included interest and fees that Mr. Mills did not owe.

61. SLS postponed the foreclosure sale several times. It rescheduled the foreclosure sale on July 19, 2023 and then on November 1, 2023. Each time, it took steps to advance the foreclosure sale, including by advertising the sale, without first providing Mr. Mills with the proper notices.

62. For example, neither SLS nor its agents ever provided Mr. Mills with a notice that contained the correct amount required to cure his default, because the notice included amounts for interests and fees he did not owe, resulting more than double the amount to reinstate than would be allowed by law.

63. Mr. Mills continued to try and work with SLS to find a solution that he could afford to save his home. He re-applied for a loan modification, but SLS would not approve him for any options that did not require a large downpayment.

64. Mr. Mills did not understand how he could lose his home after all this time or how he could owe so much money after SLS had ignored him for more than a decade.

65. To try and get additional information about his second mortgage—which he still believed was resolved in 2009—Mr. Mills sent SLS a Qualified Written Request in October 2023.

66. This letter contained all the necessary information to be considered a Qualified Written Request, including Mr. Mills's personal information and the loan information, and was sent to the address that SLS has designated for Qualified Written Requests.

67. Mr. Mills's Qualified Written Request disputed the amount of interest that SLS had assessed to the loan and asked that SLS remove any interest, fees, or charges from January 2009 through December 2022—the time in which no one ever sent him monthly statements for the loan.

68. Mr. Mills's Qualified Written Request also disputed any loss mitigation charges that had been assessed to the loan on multiple occasions, and asked that SLS provide invoices supporting all of the fees that it had charged.

69. Mr. Mills's Qualified Written Request also asked SLS to send him documents to support his dispute including: (1) the servicing notes for his loan; (2) any monthly statements that were <u>mailed</u> to him since January 2009; and (3) the date that his loan was first accelerated, including the notice of acceleration.

70. SLS responded to Mr. Mills's Qualified Written Request on November 30, 2023.

71. SLS's response was deficient in several respects.

72. For example, SLS refused to remove any interest, fees, or charges assessed to the account or provide copies of any invoices supporting the loss mitigation charges.

73. This response was not correct because Mr. Mills did not receive statements before January 2023, and therefore SLS was not permitted to charge interest or fees.

74. In fact, while SLS asserted that it "generated" monthly statements for Mr. Mills's account for the last ten years, it refused to admit that the statements were actually mailed, as Mr. Mills's letter specifically requested.

75. This is not a distinction without a difference—instead, that the statements were never sent to Mr. Mills is critical to the issue of whether the interest and fees can be assessed.

76. Instead, it appears that these statements may have been generated, but were never mailed, given that Mr. Mills did not receive a single statement, despite always living at the property from March 2005 onwards.

77. Further, this error, appears to be a systematic problem that have effected numerous consumers who did not receive statements from SLS for man years, but then were retroactively assessed interest and fees for those periods.

78. In response to his QWR, SLS also refused to provide many of the documents that Mr. Mills requested, including the servicing notes.

79. Because of SLS's conduct, Mr. Mills has suffered actual damages, including significant loss of equity in his home, emotional distress caused by the fear of losing a home where he has lived for more than 20 years, and informational injury.

## COUNT ONE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692e(10)
### (Class Claim)

80. Mr. Mills incorporates the preceding allegations.

81. Under Federal Rule of Civil Procedure 23, Mr. Mills brings this action for himself and on behalf of the following class:

> All consumers: (1) with a loan that was in default at the time SLS became the servicer of the loan; (2) to whom SLS sent correspondence in the one year predating the filing of this lawsuit; (3) seeking to collect late fees, default-related fees or interest assessed by SLS for time periods when the consumer did not receive monthly statements from SLS.

82. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Mr. Mills alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS services thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. SLS's records will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through SLS's internal business records, and they may be notified of this litigation by published or mailed notice.

83. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether SLS is a debt collector; (2) whether SLS violated § 1692e of the FDCPA by making false representations about Mr. Mills's and putative class members' debts; and (3) the appropriate amount of statutory damages.

84. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Mr. Mills's claims are typical of the claims of each putative class member. He is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

85. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Mr. Mills is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Mr. Mills has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Mr. Mills and his counsel will fairly and adequately protect the putative class

members' interests. Neither Mr. Mills nor his counsel have any interests that might cause them to not vigorously pursue this action.

86. **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

87. SLS violated § 1692e(10) of the FDCPA by using false representations to collect or attempt to collect debts from Mr. Mills and the putative class members.

88. For example, SLS falsely represented that Mr. Mills and the putative class members owed late fees and interest for the months that they were not sent monthly statements.

89. SLS's statements were false. Mr. Mills and the putative class members did not owe these late fees or interest because they were not sent monthly statements.

90. Mr. Mills and each putative class member suffered a concrete injury in fact because of SLS's misrepresentation including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-making decisions, and emotional distress.

91. In addition, some class members suffered actual damages when they paid these improper fees to SLS.

92. Under 15 U.S.C. § 1692k, Mr. Mills seeks actual and statutory damages for himself and each putative class member and his reasonable attorneys' fees and costs. He also seeks actual damages for the class members in the amount of the improper fees that they paid to SLS.

## COUNT TWO:
### Violation of FDCPA, 15 U.S.C. § 1692f(6)
### (Individual Claim Against SLS)

93. Mr. Mills incorporates the preceding allegations.

94. SLS violated 15 U.S.C. § 1692f(6) attempting to foreclose on Mr. Mills's property. SLS did not have any present right to possession of the property at the time that it conducted foreclosure activities, including scheduling foreclosure sales and advertising the sale, because neither SLS nor its agents ever sent Mr. Mills a notice that complied with Va. Code § 55.1-321.

95. Additionally, SLS did not send a pre-acceleration notice that complied with the Deed of Trust because any pre-acceleration notices sought amounts that Mr. Mills did not owe.

96. For example, the notice that SLS's agents sent to Mr. Mills and any pre-acceleration notices did not comply with Virginia law because they listed an inaccurate outstanding balance and an inflated amount to cure the default.

97. Because of SLS's violations of 15 U.S.C. § 1692f, Mr. Mills suffered actual damages, including loss of equity and significant emotional distress.

98. Based on SLS's violation of § 1692f, Mr. Mills is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

## COUNT THREE:
### Violation of RESPA, 12 U.S.C. § 2605(e)(2)
### (Individual Claim Against SLS)

99. Mr. Mills incorporates the preceding allegations.

100. As alleged above, Mr. Mills submitted a qualified written request to SLS, and SLS received the request.

101. SLS violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Mr. Mills's account, including removal of the improper interest from his account.

102. SLS also violated 12 U.S.C. § 2605(e)(2) by failing to provide Mr. Mills with most of the information he requested or to explain why the requested information was unavailable.

103. Because of SLS's conduct, Mr. Mills suffered concrete and particularized harm, including: assessment of fees and charges that he did not owe, and emotional distress, including aggravation and stress.

104. Upon information and belief, discovery will reveal that SLS's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

105. SLS has also been sued multiple times for failing to properly respond to Qualified Written Requests, including by failing to conduct proper investigations or provide information.

106. In addition, the Consumer Financial Protection Bureau's consumer complaint portal shows that 7,646 mortgage-related complaints have been filed against SLS as of January 9, 2024, including 136 complaints for failing to investigate an existing problem.

107. Mr. Mills is entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Mills, on behalf of himself and the putative class members, moves for class certification and for statutory and actual damages, as well as his attorneys' fees and costs as pleaded above against SLS for the class claim, as well as actual and statutory damages, and

attorneys' fees and costs for his individual claims; for pre-judgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**LARRY MILLS**

By: */s/ Kristi C. Kelly*
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #93738
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com
*Counsel for Plaintiff*